FILED

2019 APR -8 PM 2:51

CLERK U.S. DISTRICT COURT
MIDDLE DISTRICT FLORIDA
TAMPA, FLORIDA

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**Gordon Wayne Watts, Individually,**
**and on behalf of similarly situated**
**persons** (some, but not all, whom are
named in the instant complaint)

**Lead Plaintiff,**

**vs.**

Case No.: **8:19 cv 829 T36 cpT**

\* Circuit Court of Cook County, Illinois ; and,

Hon. JAMES P. FLANNERY, JR., **in his Individual Capacity – and in his Official**
**Capacity as** Presiding Judge, Law Division, Cook County, IL circuit court ;
Hon. DIANE M. SHELLEY, **in her Individual Capacity – and in her Official**
**Capacity as** Circuit Judge, Law Division, Cook County, IL circuit court ;
Hon. MICHAEL F. OTTO, **in his Individual Capacity – and in his Official Capacity**
**as** Associate Judge, Chancery Division, Cook County, IL circuit court ; and,

\* Appellate Court of STATE OF ILLINOIS, First District ; and,

JUSTICE DANIEL J. PIERCE ; JUSTICE MARY L. MIKVA ; JUSTICE JOHN C.
GRIFFIN ; JUSTICE MARY ANNE MASON ; JUSTICE TERRENCE J. LAVIN ; JUSTICE
MICHAEL B. HYMAN ; and, JUSTICE CARL ANTHONY WALKER ; **in their**
**Individual Capacities – and, in their Official Capacity as** Justices for the First District
Appellate Court of STATE OF ILLINOIS,

**Defendants.**

---

**VERIFIED COMPLAINT AND REQUEST FOR Declaratory and Inductive relief;**
**For unspecified monetary damages ; Request for Certification as a Class (Class Action);**
**For R.I.C.O. Certification; AND, INCORPORATED MEMORANDUM OF LAW**

Plaintiff, Gordon Wayne Watts, *pro se,* hereby sues the defendants, and alleges as follows:

### I.  INTRODUCTION

**1. Plaintiff is an individual,** representing himself *pro se,* with residence located at

**Page 1 of 40**

2046 Pleasant Acre Drive, Plant City, Florida 33566-7511, and whose residence, during the majority of the litigation underpinning this complaint, was at 821 Alicia Road, Lakeland, Florida 33801-2113, until his landlord gave notification of a planned demolition of the property, and requisite eviction of the tenants, which included Plaintiff, Watts. [This is mentioned to verify that the "Gordon Watts from Lakeland" who signed paperwork in underlying litigation is the same "Gordon Watts in Plant City" filing the instant complaint.]

**2. Plaintiff, Watts, is not a lawyer, but he is:**

[[A]] the same "Gordon Watts" who nearly won **the infamous "Terri Schiavo" case <u>all by</u> <u>himself, in proceedings before</u>** the Florida Supreme Court. **[See Exhibit-A]** ; and:

[[B]] the same "Gordon Watts" who was the <u>only</u> *pro se* (non-lawyer) litigant which the U.S. 11TH CIRCUIT Federal Appeals Court allowed to submit an *Amicus Curiae* (Friend of the Court) brief in the recent consolidated "Gay Marriage" cases **[See Exhibit-B]** ; and:

[[C]] the same "Gordon Watts" who wrote 2 columns and 1 letter to *The Lakeland Ledger* with very embarrassing allegations of social media blocking <u>and</u> claims of promises made by his good friend, former Congressman, Dennis A. Ross, of Lakeland, Florida. **[See Exhibit-C]**

**3. Plaintiff includes these "off-topic" items in point #2, above, in order to** assure **This Court** that while the instant complaint may be a "difficult" legal matter (both politically difficult, in accusing almost entire state court system of serious 42 U.S.C. 1983 violations, *and* legally-complex, as well), that the plaintiff, while human, has demonstrated that he can be trusted to not waste a reader's time: Specifically, he did better in court than Gov. Jeb Bush in the *Schiavo* case, almost winning it (and thus can be trusted to present a coherent legal

**Page 2 of 40**

presentation to This Court). Moreover, no matter your views on Higher Ed economics or social media bullying (the 2 subjects of the columns and letter which plaintiff wrote for the paper), **the "relevant" point for <u>This Court</u> is plain-and-simple:** *The Lakeland Ledger* refused to publish anything about what the lawmaker allegedly said in town halls and/or did when rogue staff (which later got fired for this) were "blocking" people on the official governmental social media of said congressman—**until the writer (Plaintiff, Watts) offered cited sources and documented proof** of all such allegations. Therefore, Plaintiff includes this "off-topic" material (in point #2, above) to show **This Court** that while he makes **'strong' allegations of <u>fact and law,</u>** about what he alleges are "corrupt" ILLINOIS Courts, plaintiff can be trusted to be both <u>academically</u> coherent (legal bases) as well as <u>morally-trustworthy</u> (to only allege what actually happened, and not exaggerate or "make up" stuff out of revenge or anger or frustration with bad state court decisions), – and be able to document all allegations.

    **<u>4.</u>** The named defendants, in the caption, acting under the Colour of Law, not only deprived Plaintiff, Watts, of his Due Process (causing great monetary loss), <u>but also placed the **life and health** of another party (who is elderly) in grave danger, by virtue of</u> the title-theft of his Home, Land, and a <u>documented</u> Hundreds of Thousands of dollars of equity in said property. Since making an elderly person homeless necessarily **places ones <u>life and health</u> in danger,** this fact is being stated "up front" to give This Court a "head's up" as to why Plaintiff, Watts, seeks injunctive relief (and may, if it becomes necessary to avoid irreparable and imminent harm, seek TRO relief), as cited in the title of this complaint.

**5.** Plaintiff shall include a representative sample of **legal documentation** in this complaint, to help the court understand –and verify –and grasp the complaint; **however, due to limitations on computer printer capabilities,** much of the documentation will have to be submitted in one of four (4) *other* ways: **(1.)** Plaintiff has posted ALL documents in question on 2 mirrors online, which can be accessed at the **"Mortgage Fraud" story, dated Fri. 14 April 2017**—see e.g., the "Open Source Docket" link in said **"front-page news"** item at either https://GordonWatts.com (Hosted by GoDaddy in Mesa, AZ) or https://GordonWayneWatts.com (Hosted by HostGator in Dallas, TX) ; **(2.)** Alternatively, Plaintiff hopes to motion This Court for **CM/ECF** privileges and submit key docs electronically ; **(3.)** This Court can order the state courts in question to submit filings (but this is not favoured, as it's slow & tedious) ; **(4.)** Lastly, This Court can simply take my word on assertions of fact (but this is not favoured, as it would probably violate both the Due Process of the defendants, and most certainly violate the moral underpinnings of Fair Play).

## II.  PARTIES TO THE CASE (summary)

**6.** "Defendant" parties to the complaint are all named in caption. However, there are several more potential "plaintiff" parties **[see par.84, below]**, whose Federal Civil Rights were deprived in the underlying state actions. Lead plaintiff, Gordon Wayne Watts, not being a lawyer, doesn't know if it's appropriate to include all of them in the caption, as we're unable to get a lawyer to properly address "how to" include all "class action" parties in a complaint. But, lead plaintiff, Watts, hopes to motion This Court to include Richard Daniggelis (whose house and land were taken in title theft, and who owes Watts **much documented** monies for

research, tech/computer help, etc.), Daniggelis' attorney, Andjelko Galic, and Robert J. More, a former tenant of Daniggelis. There are also more potential class parties, as I represent to This Court that I've been contacted by some of my blog's readers that they, too, have had their Civil Rights deprived by ILLINOIS STATE COURTS, but, as yet, I have no further information.

### III.  PRELIMINARY STATEMENT

7. **Defendants violated numerous national laws, statutes, ordinances & regulations, including but not limited to:** Federal Due Process & 1st Amendment rights of Redress & access to the courts and the ability to have meaningful access to appeal an adverse decision, under the 5th amendment (as incorporated to the states through the 14th amendment), as well as Federal Equal Protection for said access on "equal basis" as protected by 14th amendment and relevant Federal case law.  **The overt acts of fraud and collusion in this matter, which were engaged in by the defendants to deprive Gordon Wayne Watts** *(and other members of the plaintiff class)* **of his** *(their)* **Federal Civil Rights [and which give rise to a R.I.C.O. (Racketeer Influenced and Corrupt Organizations Act) claim], include, but are not limited to: [[a]]** blatant lies by the appeals court about its alleged lack of authority to hear appeals, **[[b]]** blatant lies by the appeals court about its alleged lack of authority to **hear / grant** "Rule 321" motions to limit the record (to an amount that Plaintiff, Watts, could afford), **[[c]]** requiring an impossibly-expensive fee to produce decades of court records for things such as a simple IFP *(In Forma Pauperis)* petition/application to proceed without payment of fees, and **[[d]]** collusion by circuit court

**Page 5 of 40**

judges to ensure that a proper motion for intervention was not going to be heard on the merits at the circuit court level, as well as [[e]] collusion between the circuit and appellate court to ensure that a "limited record" – which Plaintiff, Watts, could afford, would not be permitted, thus resulting in Plaintiff either having only two (2) choices: [[#1]] Either pay an estimated TEN THOUSAND ($10,000.oo) DOLLARS for a simple appeal & request for Summary Judgment, –or else [[#2]] be deprived of access to appeal an adverse decision. Point [[e]] was accomplished by R.I.C.O. cooperation between Circuit and Appellate judges to deny the Rule 321 motion, evident by the fact that both courts had such authority. The result was lack of ability to appeal an adverse decision, unless one had tens of thousands of dollars handy.

## IV. BASIS FOR JURISDICTION and VENUE / NATURE OF SUIT – ORIGIN

**8.** The **nature** of this complaint is a 42 U.S.C. §1983 Civil Rights basis, and its **origin** is an original proceeding, filed in the Federal Circuit Court, under Rule 3, Fed.R.Civ.P., Commencing an Action. Plaintiff brings this action under 42 U.S.C. §§1983 and 1988, to redress the deprivation under colour of state law (both facial, and as applied—specifically, the ILLINOIS state law, "Rule 321," which prohibits access to appeal an adverse decision if "the entire" record is not produced—even for simple decisions like IFP applications).

**9.** This court has **territorial jurisdiction** because plaintiff lives within the Tampa Division of the Middle District of Florida, U.S. District Court. This Court also has **subject-matter jurisdiction** over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights).

**Page 6 of 40**

**10.** Moreover, This Court has authority and jurisdiction to enter **declaratory judgment** and to provide both **preliminary and permanent injunctive relief** pursuant to Rules 57 (Declaratory Judgment) and 65 (Injunctions and Restraining Orders), Fed.R.Civ.P., and 28 U.S.C. §§2201 (Creation of remedy) and 2202 (Further relief) – as well as "Issuing Without Notice" a **Temporary Restraining Order** pursuant to Rule 65(b), to prevent "irreparable injury, loss, or damage." **Rule 57** provides that "The existence of another adequate remedy does not preclude a **declaratory judgment** that is otherwise appropriate."

**11.** This Court has **personal jurisdiction** over defendants, via "Long Arm Jurisdiction": Rule 4(k)(1)(A), Fed.R.Civ.P., provides that "Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," which means that if Florida's state laws confer personal jurisdiction in state matters, then This Court can use R.4(k)(1)(A) to "piggyback" onto Florida's long-arm statutes.

**12.** Florida's "Long-Arm" statute is **§48.193,** which provides that: "A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts: … Committing a tortious act within this state." **§48.193(1)(a)(2.), Fla.Stats. (2018).** Moreover, in *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209 (Fla. Dist. Ct. App. 1999), the Circuit Court of Appeals for the 11th Circuit (our circuit) held that under the Florida long-arm statute, the court may assert

**Page 7 of 40**

personal jurisdiction over nonresident for tortious act committed outside the state that causes injury inside the state—which, of course, applies here, as ILLINOIS STATE COURTS, and their employees, in their Individual Capacities, have indeed committed numerous tortious acts. So, This Court has personal jurisdiction—if it meets Federal caselaw standards (below).

13. The U.S. Supreme Court, in *International Shoe v. Washington*, 326 U.S. 310 (1945) and later on in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), has held that a person must have minimum contacts with a State, in order for a court in one state to assert personal jurisdiction over a defendant from another state. *Int'l Shoe* held that held that for a defendant to have "minimum contacts," the defendant needs some combination of the two following factors: ((1)) systematic and continuous activity within the forum jurisdiction; and ((2)) a cause of action arising from that activity. In *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102 (1987), the Supreme Court clarified that even when the defendant has a minimum contact, a court's asserting jurisdiction over the defendant may still be improper as if it would be unfair to the defendant: *Asahi Metal* held that "Long-Arm" Personal Jurisdiction over an out-of-state defendant should be evaluated according to the following five factors: [[1]] burden on the defendant, [[2]] interests of the forum state, [[3]] interests of the plaintiff in choosing the forum, [[4]] efficiency concerns, and [[5]] interstate policy interests.

14. There was both "systematic and continuous activity within the forum jurisdiction" (by virtue of the numerous tortious acts committed under colour of law), as well as a "cause of action" (namely the Civil Rights deprivations cited above in this complaint), which

**Page 8 of 40**

satisfies *Int'l Shoe.* Evaluating the factors in *Asahi Metal,* it is clear that "interstate policy interests" in clearing up long-held and well-known corruption in ILLINOIS and CHICAGO courts is favourable to asserting personal jurisdiction. Moreover, the burden on the defendants in litigating out-of-state is minimal because they have the time and resources to both participate electronically (teleconferencing), as well as travel (should they need to). Plaintiff, on the other hand, beleaguered by poverty, has interests in avoiding the possible risks of having to travel to a circuit court in ILLINOIS, as well, as face "venue bias" for asking a local circuit judge to – basically – say that a huge portion of that state's judges (whom he or she would likely know on first-name basis) are committing civil, and possibly criminal, torts. Lastly, efficiency concerns (especially time-saved in declining to transfer the case under review, here) weigh heavily in favour of asserting personal jurisdiction over defendants, and declining to invoke 28 USC §1404(a) (Change of venue).

### V. VENUE is proper in the Middle District of Florida

**15.** This Court has jurisdiction, and venue is proper in this district (28 USC §1391). "A civil action may be brought in...a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." **(28 USC §1391(b)(2), Venue generally)**

**16.** *Fuji Photo v. Lexar Media*, **415 F.Supp.2d 370, 373 (S.D.N.Y. 2006)** held that for a change of venue to be granted, The Court must establish not only whether a transfer is even possible (it is, under 28 USC §1391(b)(1)), but also whether the convenience of the parties and the interest of justice favor transfer. (It does not: See above.) **Moreover:** "[T]he

**Page 9 of 40**

parties seeking transfer [that would be an ILLINOIS defendant, should he/she so move This Court] carries the burden of making out a strong case for transfer." *New York Marine v. Lafarge*, 599 F.3d 102, 114 (2d Cir. 2010) and must point to clear and convincing evidence on which the court can base its decision. *Lewis-Gursky v. Citigroup*, 2015 WL 8675449, *2 (S.D.N.Y. Dec. 11, 2015). Indeed, the moving party "bears the burden of clearly establishing that these factors favor transfer." *Citigroup v. City Holding*, 97 F.Supp.2d 549, 561 (S.D.N.Y. 2000). **While these cases were from New York's 2nd Circuit, they are good guidelines – and agree with our circuit, the 11th Circuit, as well: The Eleventh Circuit** has recognized that a "plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giarmarco & Bill*, P.C., 74 F.3d 253, 260 (11th Cir. 1996) (quotation and citation omitted); see *Response Reward Sys., L.C. v. Meijer, Inc.*, 189 F. Supp. 2d 1332, 1339 (M.D. Fla. 2002) (stating that "[o]nly if the [p]laintiff's choice [of forum] is clearly outweighed by considerations of convenience, cost, judicial economy and expeditious discovery and trial process should this Court disregard the choice of forum and transfer the action" (citation omitted)). **Indeed:** "Generally, in determining the merits of a § 1404(a) motion to transfer, this Court gives strong consideration to the plaintiff's choice of forum." *Suomen Colorize Oy v. DISH Network, L.L.C.*, 801 F. Supp. 2d 1334, 1338 (M.D. Fla. 2011). **[Which is <u>our</u> district, the Middle District of Florida.]**

17. Therefore, venue is proper in the Middle District of Florida, and **This Court** may, here and now, via Long Arm Jurisdiction over out-of-state plaintiffs, exercise personal jurisdiction <u>and</u> retain venue—in order to speedily execute justice for <u>all</u> aggrieved parties –

<u>**Page 10 of 40**</u>

one of whom is very elderly, **and was made homeless (<u>thus putting his life</u> & health in jeopardy)** through the corrupt deprivation of his Federal Civil Rights by ILLINOIS State Courts—acting under the Colour of Law.

### VI.   STATEMENT of the FACTS PERTAINING to the CASE

<u>**18.**</u> **In <u>early 2006</u>,** Richard B. Daniggelis (a friend of Plaintiff, Gordon Wayne Watts), began having trouble paying on the mortgage for his house and land, and sought refinance assistance from Paul L. Shelton (a former attorney who was subsequently disbarred—**for mortgage fraud**—by the ILLINOIS STATE BAR—The Court may Google to verify), and Attorney Joseph Younes (who was Shelton's law partner at the time).

<u>**19.**</u> **On <u>May 12, 2006</u>,** Daniggelis signed an agreement with Shelton to let Shelton hold his house's warranty deed (title) in escrow, solely for the purposes of refinancing, with a "protection" clause in the contract, declaring the contract "null and void" if the closing didn't take place by May 19, 2006. (Elderly Mr. Daniggelis put that "time-restriction" in the contract to protect himself against title-theft Mortgage Fraud.) **[See Exhibit-D]**

<u>**20.**</u> Daniggelis obtained a signed statement, **dated <u>May 19, 2006</u>,** from Erika Rhone, who was working with Shelton and Younes, in which she declared that any POA (Power of Attorney) powers she might obtain were to be used solely for the refinancing described in the previous contract. (Elderly Mr. Daniggelis put that "use-restriction" in this contract to protect himself against title-theft Mortgage Fraud.) **[See Exhibit-E]**

<u>**21.**</u> **On <u>10/17/2007</u>, slightly over a decade ago,** GMAC MORTGAGE LLC, who was owed monies by Mr. Daniggelis, filed suit in Cook County, IL Chancery, Circuit Court,

**Page 11 of 40**

to foreclose on Daniggelis' house and property because he was underwater (owed) on his mortgage. **[See Watts' online docket]** Daniggelis subsequently retained Andjelko Galic, Esq.

22. On 7/24/2012, then-Chancery-Judge Mathias William DeLort (who was promoted to the appellate court) issued a ruling, royally chewing out Galic for focusing too much on a spotty record of written transfer documents (including, of course, the infamous "Linda Green" assignment fraud issues) instead of focusing on the actual mortgage fraud in question, **which was later found to be genuine, and admitted forgery of Daniggelis' signature.**

23. On 2/15/2013, Associate Judge Michael F. Otto (Chancery Division) granted a summary judgment motion of Atty. Joseph Younes, apparently holding that Daniggelis was not owner (but not ordering a change of title at that time).

24. On 3/8/2013, Judge Otto entered a 9-page Order **[see Exhibit-F], admitting** that the July 9, 2006 warranty deed "is in most respects identical" to the May 9, 2006 warranty deed that Daniggelis signed (except, of course, for the word 'July' being hand-written in), which supports Daniggelis claims that there was photocopy forgery of his signature, which forgery - all by itself - would void the entire illegal transfer of title. **[Ex.-F, p.4, top of page]**

25. Even though Judge Otto admitted the basic facts proving a felony photocopy forgery fraud (title-theft Mortgage Fraud), it is documented (by court records) that neither he, nor any other judge, has ever reversed his order handing over title to Younes, in which Daniggelis **didn't get paid a even a penny for the loss of his house, land, and the documented several hundred thousand dollars of equity he had in it.** (See Watts' filing before the ILLINOIS SUPREME COURT for said documentation, which filing is posted

**Page 12 of 40**

online as cited *supra*.)

**26. On 5/15/2014,** Judge Otto entered an order, formally finding Atty. Joseph Younes, Esq. to be the owner of the property in question—and handing Younes the title to Daniggelis' house and land, which had a documented several hundred thousand dollars of equity in it— even though Daniggelis is documented to not having ever gotten paid even a dime.

**27.** Based on what Daniggelis told Watts, in a numerous phone conversations, Watts represents to This Court (upon information and belief) that Daniggelis jumped up in court that say, and yelled at Judge Otto, to the effect: "Hey, how can you hand title over of my house, if your court has already admitted that I'm a victim of fraud, and allowing a judgment against Stewart Title – forcing them to settle with me!?"

**28.** Upon information and belief, Watts represents to This Court that Judge Otto got nervous, and explained that he would – instead – be transferring the case to The Law Division—apparently in response to having been caught using the "colour of law" to aid and abet a title theft, thus depriving Daniggelis of his Civil Rights.

**29. Subsequently,** Watts spoke by phone with Daniggelis, who related that both copies of the Warranty Deeds on file had EXACTLY the same signature, proving his claims that there was a forgery-based Mortgage Fraud-type title theft of his house/land/equity.

**30.** Watts, who respects Mr. Daniggelis, like an uncle or grandfather, became upset, and ordered (under Public Records access) records from the Cook County, ILLINOIS circuit court, and verified the accuracy of Daniggelis' claims: Both signatures were identical, impossible for a mere mortal, thus proving a "photocopy-based" forgery of a 2nd Warranty

**Page 13 of 40**

Deed, when the 1st deal fell through—thus enabling the title theft of said house and land.

**31.** **In early to mid August 2015,** Watts filed an *Amicus Curiae* brief with both the circuit court, and the appellate court, both of which were reviewing issues with Daniggelis' foreclosure (aka Mortgage Fraud) case. Both courts subsequently denied Watts' friend of the court motions. Watts disagreed with these rulings, appealing one for a time, but chose not to complain to **This Court** about the 'bad' *Amicus* rulings, since *amicus* filings are discretionary, and not obligatory: An *Amicus Curiae* does not have standing to assert Due Process.

**32.** All along, Watts was doing online research, helping to procure records from both the courts and the Internet, for Daniggelis (who did not use a computer). Additionally, Watts was helping Daniggelis learn to use a computer, Internet, email, etc. Daniggelis agreed to pay Watts a very large, but unspecified, amount of monies for his labour, but was—at that time—unable to pay Watts anything because he was dealing with loss of a house, homelessness, having to put things in storage, and the physical & emotional stress on an elderly person who is the victim of courts' aiding/abetting of the title theft of his house, land, and equity.

**33.** **On 07/06/2017 (Court-stamped on "07/07/2017," when it arrived by overnight 1st Class U.S. Postal Mail, the next day),** asserting his absolute rights under intervention law of The State of Illinois, Watts immediately filed an Intervention action in the Circuit Court, Law Division, of Cook County ILLINOIS, the Division to which the foreclosure / fraud case was transferred—to protect interests in regard to, *inter alia,* monies owed to him by Daniggelis—and documented said claims. (See 7-7-17 Intervention.)

**34.** No one contested Watts' allegations on monies owed him, which is legally-binding

**Page 14 of 40**

upon ILLINOIS courts and litigants: Per **735 ILCS 5/15-1506(a)**, that which the other parties to this case don't deny is admitted, Thus, the "law of the case" is that Watts has huge monetary interests (e.g., "sufficiency of interest," one of the three (3) prongs necessary to assert Intervention—see e.g., this quotation of Illinois statutory and case law:

> ILLINOIS state law: **735 ILCS 5/2-408(a)(2)** grants intervention as an absolute right because "the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action." ILLINOIS state law grants intervention as an absolute right because: **735 ILCS 5/2-408(a)(3)** because "the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer." **ILLINOIS case-law governing Intervention** holds that: Where intervention as of right is asserted, "the trial court's jurisdiction is limited to determining timeliness, inadequacy of representation and sufficiency of interest; once these threshold requirements have been met, the plain meaning of the statute directs that the petition be granted." See: *City of Chicago v. John Hancock Mutual Life Ins. Co.,* **127 Ill.App.3d 140, 144 (1st Dist. 1984).**

**35.** Daniggelis' attorney, Andjelko Galic (as the record amply shows) failed to prosecute the case, eventually getting dismissed at every level, & thus didn't represent anyone's interests, at that point. Watts, sensing Daniggelis' attorney wasn't representing his interests, moved for Intervention, asserting "inadequacy of representation."

**36.** The trial court never ruled on Watts' timely Motion for Intervention, filed and court-stamped on 7-7-2017, even though the court stamp documents that it was received.

**37. On 12/17/2017,** Circuit Judge, Diane M. Shelley, entered an order granting Galic's motion for non-suit (aka voluntary dismissal), in **case number 2007-CH-29738, GMAC v. Younes, et. al.,** in the Law Division, after the case was transferred there from Chancery.

**38.** Watts, in reliance of seeing his name on the docket, and in reliance of what clerks

**Page 15 of 40**

repeatedly told him, believed that his name being listed as "Defendant" was proof and evidence that his Intervention motion had been granted—and that he was now a party to the case, with legal standing to file documents, appeal rulings, etc. [See court's official docket, which lists Watts as a Defendant, and thus a party to the case, links and screen-shots of which are included in Watts' subsequent filings with various Illinois courts.]

**39. On  01/08/2018,** Watts filed a timely Notice of Appeal of said order, with the ILLINOIS First Appellate Court. [Docketed case #: **1-18-0091** before the 1st App. court]

**40. On 01/19/2018,** the appeals court granted his fee waiver application, so Watts wouldn't have to pay the small, approximately fifty ($50.oo) dollar fee. (IL Supreme Court Rule 313). However, on **03/01/2018,** Judge James Flannery denied Watts fee waiver application, applicable for the circuit court's fees. Both courts have the same standards for indigent applicants, and Watts, a Food Stamp recipient, easily qualified.

**41. Judge Flannery's  03/01/2018 order** claimed that the court never granted leave (permission) to intervene, and thus Watts was not a party, with sufficient legal standing to be entitled to fee waiver, in spite of Watts' name being clearly displayed on the official court docket as the second-lead defendant, just under Daniggelis' name—and without any explanation as to why Intervention might, legally, be denied. On **3/19/2018,** Watts sought Mandamus relief from the 1st Appellate Court to compel Flannery to do his ministerial duty and grant the fee waiver application, intervention, and preparation of a record on appeal for the 1-18-0091 appeal, which was pending the Appeals court's receiving the record on appeal. The mandamus petition was assigned case number **1-18-0538** in the appeals court.

**42.** Watts was dissatisfied with Flannery's ruling (Denying Fee Waiver application, Intervention, and preparation of the record on appeal for 1-18-0091, which is still pending, as I speak/write), and appealed that adverse order. The appeals court docketed it on **03/22/2018, and assigned it case number 1-18-0572.**

**43.** The appeals court allowed Watts to prosecute his appeal of **1-18-0572** without payment of the fee, but Watts, knowing that his prior application has been denied by Flannery for 1-18-0091, declined to ask the circuit court again for fee waiver.

**44. On 04/20/2018,** Watts moved the appeals court for Summary Judgment of his appeal in case number 1-18-0572, which was an appeal of Flannery's order denying Fee Waiver. Shortly thereafter (on 05/02/2018), Atty. Rosa M. Tumialán, and one other attorney, who has reportedly quit her law firm, entered an appearance for Plaintiff, GMAC, but did nothing further than enter an appearance.

**45. The following day, on 05/03/2018** (the same day that Watts' father, Bobby Watts, unexpectedly passed away), the appeals court entered an order denying summary judgment in appeal number 1-18-0572.

**46. On 05/09/2018,** the ILLINOIS Supreme Court entered an order denying Watts' petition for a Supervisory Order to compel the circuit and appeals courts to obey the law with regard to Intervention, Fee Waiver, and Preparation of the Record on Appeal.

**47. On 08/28/2018,** the appeals court dismissed appeal number 1-18-0572 (an appeal of Judge Flannery's order fee denying waiver), alleging "want of prosecution," in spite of the fact that it was an appeal of a simple fee waiver denial, not a "complex" matter.

**Page 17 of 40**

**48.** On **09/28/2018,** the appeals court entered an order denying Watts' petition for a Writ of Mandamus, **appeal number 1-18-0538,** and justifying that it was: "DISMISSED for lack of this Court's jurisdiction," an obvious lie, in light of clear case law and Illinois State Constitutional provisions which explicitly permit an ILLINOIS appellate state court to issue Writs of Mandamus. Subsequently, the appeals court, in an order dated, **11/29/2018,** denied a timely motion for reconsideration of its **09/28/18** order—without any explanation as to why its court allegedly lacked jurisdiction to issue such writs.

**49.** Watts, recalling an email reply from then-Deputy Chief of Civil Appeals, Patricia O'Brien, that the record on appeal was very, very huge ("Boxes") **[See Exhibit-G],** and the docket was very, very lengthy, Watts knew that it would likely cost thousands, perhaps tens of thousands, of dollars to pay for a "complete" Record on Appeal.

**50.** Watts represents to This Court that he inquired of the cost, and as both his recollection, and O'Brien's email reply indicate, the circuit court was unwilling and/or unable to give an estimate of the costs of prep of the entire common law record in this case—a requirement for a litigant who wants to appeal, unless the record can get limited.

**51.** Illinois rules only allow for a "limited" record by stipulation (agreement among all the parties—very hard, if not impossible, for warring factions), or grant of a Rule 321 motion, which gives both circuit and appeals courts authority to allows a "limited" (read: smaller, and thus not cost-prohibitively unaffordable) Record on Appeal.

**52.** On **02/27/2019,** Watts filed a "Rule 321 motion to limit Contents of the Record on Appeal" with the appeals court, so that he could get access to the appeals court.

**Page 18 of 40**

**53.** On **03/08/2019,** the appeals court entered an order granting the motion to extend time to file the Record on Appeal (and has granted similar motions to extend time for this one case that is still "alive," namely: 1-18-0091, the other two appeals having been dismissed). However, in that same order, the appeals court (Justices Mikva, Griffin, and Walker, for the court), said that: "Appellant is advised that this court cannot issue an order determining the contents of the record to be provided by the circuit court. All issues regarding the record must be addressed with the circuit court," in spite of the clear language of ILLINOIS Supreme Court Rule 321, which is binding upon all Illinois state courts.

**54. In that same order, dated 03/08/2019,** the appeals court declared that: "This is the FINAL EXTENSION that will be allowed for filing the record. If the record is not filed by May 28, 2019, this appeal will be dismissed for want of prosecution," which roughly translates to: "we will be soon punishing you, and dismissing your appeal – for failing to file a record, even though **it is clearly _our_ fault that you can't file** an affordable record for your open-and-shut case."

**55.** Lead Plaintiff, Gordon Wayne Watts (as documented in filings before these ILLINOIS state courts) has experienced numerous hardships, including (but not limited to), his father passing away (Bobby Watts: 01-27-1935 — 05-03-2018), Watts, himself, almost dying the following month due to a bad reaction to OTC (over the counter) pain meds, and nearly bleeding to death with a G.I. (gastrointestinal) bleed, and then, he and his mother getting evicted, and having to move all their life's belongings to the family house – which then needed extensive cleaning and repair before it could be livable. This is relevant to show

two (2) things: First, it helps explain slowness and time-gaps in filing on some occasions, on the part of Watts, and secondly, it gives an idea of how a person is already under heavy life-stresses, and thus more vulnerable (and helpless) in the face of serious deprivations of liberty, one of which made an elderly man homeless, thus being no small jeopardy to both his life and health. (The second point is general in references both Watts, whose hardships are summarised and Daniggelis, who is elderly and was made homeless by the title-theft styled Mortgage Fraud, facilitated by what even the trial court admitted was a duplicate signature type forgery.)

56. **When it became clear that Illinois circuit and appellate courts,** *both of whom had "Rule 321" jurisdiction to "limit the record (on appeal)" to an amount that was affordable (thus allow Watts a chance to seek appellate review of the decision denying him intervention, where he had/has great interests, financial & emotional, to name a few),* **decided to "pass the buck" back and forth, and deny Watts access** to have his redress reviewed on the merits (by either circuit *or* appeals courts), **then Lead Plaintiff, Watts,** invoked the jurisdiction of **This Court** to seek redress of the numerous Federal Civil Rights denials done by state actors acting under the "colour of law," **and is doing so, here and now, by this brief, here.**

### VII. MEMORANDUM OF LAW [[ 42 U.S.C. §1983 ]]

57. In order to establish liability under §1983, the plaintiff must prove that he has been deprived of a federal statutory or constitutional right by someone acting "under color of" state law. *Parratt v. Taylor*, **451 U.S. 527, 535 (1981).** *See also Lugar v. Edmonson Oil*

**Page 20 of 40**